<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

</div>

**IN THE MATTER OF:**                    **CASE NO. 18-10627**

**TRINITY INVESTMENT GROUP LLC,**        **Chapter 11**

      **Debtor.**

<div align="center">

**DISCLOSURE STATEMENT**

**I.**

*A. Introduction*

</div>

Trinity Investment Group LLC, the Debtor-in-Possession, provides this Disclosure Statement to all of its creditors in order to disclose that information deemed by the Debtor to be important and necessary for exercising their right to vote for acceptance of the Plan of Reorganization filed with the Court on **October 11, 2018**.

Those creditors whose claims are impaired under the Plan may vote on the Plan by filling out and mailing to Daniel J. Skekloff and Scot T. Skekloff, Haller & Colvin, PC, 444 E. Main Street, Fort Wayne, Indiana, 46802, a Ballot which will be supplied by the Court. In order for the Plan to be accepted by Ballot, Ballots of voting creditors who hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of allowed claims of all Classes must be cast in favor of the acceptance of the Plan.

NO REPRESENTATIONS CONCERNING THE DEBTOR (PARTICULARLY AS TO THEIR FUTURE BUSINESS OPERATIONS, VALUE OF PROPERTY, OR THE VALUE OF ANY PROMISSORY NOTE TO BE ISSUED UNDER THE PLAN) ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN AS CONTAINED IN THIS STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS AND/OR INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. THE RECORDS KEPT BY THE DEBTOR ARE DEPENDENT UPON INTERNAL ACCOUNTING PERFORMED BY THE DEBTOR. FOR THE FOREGOING REASON, AS WELL AS BECAUSE OF THE COMPLEXITY OF THE DEBTOR'S FINANCIAL MATTERS, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE.

### B. General Information

Essentially, the purpose of any reorganization or rehabilitation under chapter 11 is to preserve the assets of the Debtor and save it from disastrous or premature sales, such as at foreclosure, so that junior interests (junior mortgage holders and unsecured, general creditors, and Debtor) will receive the greatest possibility of preserving their right to recovery or equity in the Debtor's property. Plans of Reorganization providing for extensions of debt as a primary system of restructuring finances appear to be the most practical solution of the problem under chapter 11 of our present Bankruptcy Code.

There are limitations on what a debtor can do under a Chapter 11 Plan; primarily, a Plan may be confirmed over the objections of a Class of secured creditors only if the Court finds that those creditors are given fair and equitable treatment, and secured creditors must receive the "indubitable equivalent" of the value of their security. However, "indubitable equivalent" does not necessarily mean that secured creditors must receive payment right away; what it means is that the secured creditors, if they must wait, are entitled to a reasonable rate of interest on their money until they are paid. In other words, where a secured creditor is receiving payment in full over a reasonable period of time, with an appropriate interest or discount factor being paid, that creditor is receiving all the law requires, that is - full payment over a reasonable period of time. Under the new Bankruptcy Code, the term of any mortgage debt may be extended; payments required under the mortgage, of either principal or interest, may be postponed; and deferred or reduced payments of principal or interest may be added to the mortgage balance. Illustrative of this point is the case of In re Hollanger, 8 B.C.D. 365 (1981) involving farmers in which the Court allowed postponement of arrearages on mortgage debt for seven (7) years.

### C. General Background

Trinity Investment Group LLC (sometimes hereinafter referred to as "Trinity", "Debtor" and/or "Debtor-in-Possession") has its office headquarters located in Bluffton, Indiana. The company operates Subway® restaurants located in northern Ohio. At the commencement of the case, Debtor operated 15 store locations. Post-petition, one of the stores which was located at Rossford, Ohio (franchise #266) has been closed.

The store locations operated by the Debtor were acquired from Sigma Restaurants, Inc. ("Sigma Restaurants") in 2013. Trinity operates the remaining 14 store locations, but does not own the rights to the franchise – see Part I. Section H. - Franchise Ownership Structure below. Trinity has, by assignment, the right to operate the Subway® stores, but is not the owner of the franchise rights for the stores. James ("Jim") Miller is the owner of the Subway® franchise rights to the stores. Mr. Miller is the president of the Debtor.

Debtor's financial difficulties result from several factors including the cost of the acquisition of the stores from Sigma Restaurants, decline in sales over a period of several years and lower net margins resulting from discounting programs. The stores operated by the Debtor were acquired from Sigma Restaurants in May 2013. In the transaction, the rights to operate 15 stores were acquired. See Part I. Section J. - Sigma Restaurant Inc. Transaction below.

Debtor executed a promissory note in the amount of $5,150,000 in connection with the purchase from Sigma Restaurants. Debtor defaulted on the note and Sigma Restaurants filed a lawsuit in October 2016 as a result. This litigation continued and was pending when Debtor filed its chapter 11 case. In the years preceding the chapter 11 filing, Debtor experienced a decline in sales in the operation of the Subway® restaurants. Further, the franchisor set forth coupon and discount programs for purposes of increasing sales. However, the discounts and coupons that the Debtor would accept as part of such programs were not reimbursable from the franchisor. This impaired the margins of the Debtor's business.

Faced with the continued pending litigation with Sigma Restaurants and its action to obtain judgment on the note balance and Debtor's lack of ability to refinance the debt, Debtor sought relief under chapter 11 of the United States Bankruptcy Code.

### D. Commencement of the Chapter 11 Case

On April 13, 2018, Trinity Investment Group LLC filed a Voluntary Petition Under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Indiana, Fort Wayne Division. Trinity Investment Group LLC continues in possession of its property and manages its business as Debtor-in-Possession under §§1107 (Rights, powers and duties of debtor-in-possession) and 1108 (Authorization to operate business) of the Bankruptcy Code. No trustee or examiner has been appointed in the Debtor's reorganization case. The Bankruptcy Court entered its Notice of Status as, and Obligations of, Debtor-in-Possession in Chapter 11 on April 16, 2018.

### E. Creditors' Committee

The office of the United States Trustee has not appointed an Unsecured Creditors' Committee.

### F. Retention of Professionals

At the commencement of the Debtor's reorganization case, the Debtor retained Daniel J. Skekloff and Scot T. Skekloff, as co-bankruptcy counsel, each of whom has been authorized to represent Trinity Investment Group LLC as Debtor-in-Possession by Order Authorizing Employment of Attorney dated June 12, 2018. Additionally, Debtor anticipates employing David Cole and Haines, Isenbarger & Skiba, LLC to perform accounting services for the Debtor.

### G. Pre-Petition Equity Security Holders

At the commencement of the case, Debtor submitted the following list of equity security holders indicating the following ownership of the membership interests in the limited liability company:

Vision Investment Group, Inc.                81% ownership interest
0505 N. 100 W.
Bluffton, IN 46714

William Stose                                      19% ownership interest
58363 Timber Leaf Court
Elkhart, IN 46517

### *H. Franchise Ownership Structure*

1.      The Subway Franchises. Debtor operates Subway® restaurants located in the state of Ohio. However, Debtor does not own the franchise rights for the 14 Subway® stores that it presently operates, but rather has an oral assignment of the right to operate the stores. In the acquisition transaction from Sigma Restaurants and Suresh K. Nanda, Jim Miller acquired from Suresh Nanda the franchise rights with respect to the stores. The franchisor, Doctor's Associates, Inc., the owner of the Subway® brand, allows franchisees to only be natural persons. However, the franchisor does allow and will authorize a business entity to be assigned the rights to operate a franchise store. In the transaction with Sigma Restaurants and Suresh Nanda, Jim Miller acquired the franchise rights to the Subway® stores. Mr. Miller then, with the franchisor's approval, assigned the right to operate the stores to Vision Investment Group, Inc. [Vision Investment Group, Inc. is also presently proceeding under a separate chapter 11 proceeding – see Part I. Section K. Affiliate Case below.] Vision Investment Group, Inc., in turn, assigned the right to operate these stores to the Debtor, Trinity Investment. The assignment from Vision Investment to Trinity Investment is not in writing, but Trinity has been operating the stores since June 2013 under this assignment of the authority to operate the stores. Debtor has identified that the assignment from Vision Investment to the Debtor is an oral assignment, but that it has been approved by the franchisor. As noted, Jim Miller is the owner of the franchise rights with respect to the stores.

Accordingly, for each of Subway® restaurant stores being operated by the Debtor, there is a separate Franchise Agreement between Doctors Associates, Inc. (Subway), the Franchisor, and James E. Miller, II, as Franchisee. Mr. Miller is the franchisee in each Agreement for each of the 14 Trinity operated stores because it is the policy of Subway that each of its franchisees be an individual and not a company or other organization. Pursuant to paragraph 9.B. of the franchise agreement, the Franchisee may, with Subway's consent, assign the right to operate the Subway franchise store, but only the right to operate. No other rights of the Franchise Agreement may be assigned.

Additionally, the stores from which the Subway® restaurants are operated are leased facilities. The tenant as to all stores operated by the Debtor is Subway Real Estate Corp., an entity unrelated to the Debtor that is affiliated with the franchisor, Doctor's Associates, Inc. Jim Miller, individually, is the sub-tenant as to each of the stores operated by the Debtor. Mr. Miller has authorized the Debtor to operate the stores at the leased locations. Debtor has filed a Motion to Assume Debtor's Interest in Real Estate Sublease with respect to each of the [14] store locations operated by the Debtor. Sigma Restaurants, Inc. has objected to four of the Motions to Assume filed by the Debtor as it is the owner of the real estate subject of those four subleases. These four motions and objections filed are presently pending.

As noted, each of the 14 Subway® restaurant stores operated by the Debtor are on leased premises. In each case, as a requirement of Doctors Associates, Inc. (Subway), the Tenant must be Subway, or more specifically, Subway's affiliate, Subway Real Estate Corporation (SREC). SREC

then in turn subleases the store to the franchisee. Accordingly, the sublease must be an individual. For each of the Trinity locations, James E. Miller, II is the Subtenant. Like the franchise agreements, the right to operate at subleased premises may be assigned with consent of Subway. Accordingly, Doctors Associates, Inc. and SREC have consented to the assignment of (only) the right to operate the Subway® stores at the subleased premises. Such assignment does not, for example, assign the right to sell the sublease leasehold interest or to sub-sublease it.

       2.    <u>Value of a Subway® Store</u>. It is common to value a Subway® restaurant store as a going concern. Such going concern valuation is typically a multiple of the store's annual EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization). The multiple applied to EBITDA is typically based upon the level of annual gross sales. In any event, value in operation is reflected in the going concern value much more than the value of the particular store's assets such as the equipment, leasehold improvements, inventory (both food and non-food items), accounts receivable and money in the cash register. These items, depending upon timing, age, and condition, might have a combined fair market value (FMV) of somewhere between $6,000.00 to $10,000.00 for any given store that the Debtor operates with such items expected to bring less in a liquidation considering short term sales and costs of liquidation. (Such items are assets of the Debtor in this case.) However, if sold as a going concern, including the franchise rights and location (sublease) rights, the price can be as much $50,000.00, $70,000.00 or over $100,000.00 per store depending upon its EBITDA and the applicable multiplier. This value assumes the sale of the store, with the full panoply of assets and rights associated with that store, including importantly the franchise and location rights. In this case, as noted above, the franchisee and subleasee rights are owned by James E. Miller, II. Debtor's proposed Plan sets forth Mr. Miller's pledge to maintain his rights as a franchisee and subtenant for the operation of the Debtor as well as for any potential sale of the stores as a going concern. See Debtor's proposed Plan of Reorganization at Article V. (page 6).

       While the Debtor currently has an oral assignment of only the limited right to operate the franchises and location premises, the proposed Plan of Reorganization provides, as his significant contribution for the membership interest of the to-be-newly-reorganized Debtor, the pledge of James E. Miller, II to maintain and combine his franchisee and sublease rights for going concern purposes and including going concern sale of the stores should the Plan fail for any reason. The going concern sale value further ensures the ability of all Plan creditors to receive full Plan payments even in the event a sale were to become necessary. Conversely, if the Debtor were to liquidate and not reorganize, the liquidation value of the Debtor's assets is believed to be less than would be realized by unsecured creditors as proposed by Debtor's Plan. See Section II. Part C. Liquidation Analysis below.

<div align="center"><u><strong><em>I. Store Leases</em></strong></u></div>

       Debtor operates the stores from leased facilities; however, Debtor is a sub-tenant as to each of the stores. As part of the operation of a Subway® franchise store, the franchisor requires that the lease of the store premises be initially entered into by Subway Real Estate Corp. Thereafter, Subway Real Estate Corp. subleases the premises for the operation of the franchise store. As it relates to the Debtor, the store leases from which the Debtor operates were ultimately assigned

from the subtenant of Subway Real Estate Corp. to Jim Miller. The Debtor makes the monthly lease payments for each of the store locations as set forth and identified in the attached projections.

Debtor has filed Motions to Assume Debtor's Interest in Real Estate Sublease with respect to each of the 14 store locations. Sigma Restaurants has filed an objection to four of these Motions as to which Sigma Restaurants, Inc. is the owner of the real estate being leased.

### *J. Sigma Restaurants, Inc. Transaction*

On May 9, 2013, Suresh K. Nanda and Sigma Restaurants, Inc. as seller, Jim Miller and Trinity Investment Group LLC as buyer, entered into an Asset Purchase Agreement ("APA") involving the sale of assets from the operation of 15 different Subway® store locations located in Ohio. These store locations were as follows:

| Store#: | Address: | City: | Purchase Price: |
|---|---|---|---|
| 1364 | 259 Golden Gate | Maumee 43537 | $503,000.00 |
| 5439 | 3107 Navarre Ave. | Oregon 43616 | $570,000.00 |
| 34724 | 3721 Navarre Ave. | Oregon 43616 | $279,000.00 |
| 266 | 480 Dixie Highway | Rossford 43460 | $400,000.00 |
| 48548 | 1137 Buck Rd. | Rossford 43460 | $335,000.00 |
| 6180 | 4870 N. Summit Street | Toledo 43611 | $410,000.00 |
| 5205 | 1564 S. Byrne Rd. | Toledo 43614 | $381,000.00 |
| 6181 | 5840 W. Central Ave. | Toledo 43615 | $303,000.00 |
| 15446 | 942 Phillips Ave. | Toledo 43612 | $319,000.00 |
| 11758 | 3336 Lagrange St. | Toledo 43608 | $190,000.00 |
| 11683 | 5447 Secor R. | Toledo 43608 | $335,000.00 |
| 6799 | 401 N. Superior | Toledo 43604 | $250,000.00 |
| 34723 | 2925 Glendale | Toledo 43614 | $250,000.00 |
| 34725 | 5821 W. Central Ave. | Toledo 43615 | $335,000.00 |
| 42172 | 2121 Reynolds Rd. | Toledo 43615 | $290,000.00 |

Two of these stores, the 480 Dixie Highway and 1137 Buck Road locations in Rossford, Ohio, are no longer in operation having been closed due to lack of profitability.

The stated sale price under the APA was $5,150,000. Also on May 9, 2013, Suresh K. Nanda and Jim Miller executed an Agreement providing that the consummation and performance of the sale contract was contingent upon Jim Miller, individually, obtaining an assignment of the franchise agreement as to each of the stores then in place between Suresh K. Nanda and Doctor's Associates, Inc. (the Subway® franchisor). Pursuant to the Subway franchise requirements only an individual can hold the franchise rights for operation of a franchise store. Doctor's Associates, Inc. authorized the transfer of the franchise rights for each of the stores from Mr. Nanda to Mr. Miller. In conjunction with the APA and sale transaction, Debtor and Jim Miller, individually, executed a Cognovit Commercial Promissory Note in the amount of $5,150,000 (the "Note") for payment of the purchase price. The Note was dated June 12, 2013. Debtor and Jim Miller, individually, also executed a Term Loan and Security Agreement document as part of the funding for the APA sale.

In an effort to perfect a security interest in assets of the Debtor subject of the Security Agreement, Sigma Restaurants, Inc., by counsel, filed a UCC financing statement with the Ohio Secretary of State on July 17, 2103. Debtor maintains that the proper location for the filing of a financing statement was and would be in the state of Indiana as that is where the Debtor is incorporated and organized and is where Debtor is deemed to be located for purposes of determining the property location for filing a financing statement to perfect a security interest in collateral. Debtor has filed an adversary proceeding Case No. 18-01067 for determination of the issue of the lien status or lack thereof as to Sigma Restaurants, Inc. Bippus State Bank is also named as a party thereto to set forth its claim of lien and priority thereof as to the assets of the Debtor. This matter is presently pending.

### K. Affiliate Case

Vision Investment Group, Inc. ("Vision Investment") is an affiliate of the Debtor as that term is defined in 11 U.S.C. § 101(2). The equity ownership of Vision Investment is as follows:

James E. Miller II          90%
Becky Miller (spouse)       10%

Vision Investment filed for relief under chapter 11 of the United States Bankruptcy Code on May 11, 2018. The case is presently pending in the United States Bankruptcy Court, Northern District of Indiana, Fort Wayne Division, Case No. 18-10864.

### L. Synopsis of Tax Implication for Reorganization

For income taxation purposes, Trinity Investment Group LLC was treated as a pass-through entity such that the income and expenses thereof were reported on the 1065 Partnership Return for the LLC. Schedule K-1 returns were issued to the membership interest owners, Vision Investment Group, Inc. and William Stose. As such, prior to the commencement of the case, Debtor had no net operating losses (or "NOL's") that were available to it. As such, Debtor has been advised that the impact of Debtor's reorganization involves reduction of Debtor's future ability to recognize depreciation expense inasmuch as Debtor's tax basis in Assets of the reorganized Debtor is subject to reduction by the amount of actual discharged debt realized through the bankruptcy proceeding. As such, to the best of Debtor's current knowledge, information and belief, the impact of reorganization and any discharge of debt as may be provided under the proposed Chapter 11 Plan would be to reduce Debtor's tax basis of Assets, such reduction being no greater than the amount of Debtor's discharged debt through confirmation of the Chapter 11 Plan.

The Debtor's proposed Plan provides for the restructuring of the debt obligations of the Debtor with the potential for discharge of certain indebtedness existing at the commencement of the case. As such, the federal income tax consequences of the complex and are subject to significant uncertainties. The Debtor has not requested a ruling from the Internal Revenue Service or an opinion of counsel concerning same.

By this statement, Debtor and Debtor's counsel are not and should not be construed to be rendering tax advice to any creditor, party in interest or recipient of this Disclosure Statement.

Notwithstanding the foregoing, should anything contained herein be deemed to be now or at a later time tax advice, the following disclosure is made: To ensure compliance with the requirements imposed by the Internal Revenue Service under Circular 230, Debtor informs you that any U.S. federal tax advice contained in this communication (including attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code, or (2) promoting, marketing or recommending to another party any matters addressed herein.

Accordingly, any person who may be affected by implementation of the Plan, including creditors and equity interest holders of the Debtor, should consult their own tax advisors with respect to and/or regarding the tax consequences under federal and any applicable state, local, commonwealth or foreign law.

### M. Current (Post-Petition) Operations

Trinity Investment Group LLC has since the filing of the Petition, continued in its operation. Since the date of filing, Trinity Investment Group LLC, pursuant to operating reports filed, have had the following operating income and expenses from its operation:

*April 2018*:

| | |
|---|---:|
| Total Income: | 225,823.44 |
| Total Cost of Goods Sold: | 40,327.73 |
| Gross Profit: | 185,495.71 |
| Total Expenses: | 119,509.92 |
| Net Ordinary Income: | 65,985.79 |
| Net Other Income: | 64.22 |
| Net Income: | 66,050.01 |
| | |
| Total Receipts: | 264,391.77 |
| Total Disbursements: | 139,675.67 |
| Net Cash Flow: | 124,716.10 |

*April 2018 (Amended)*:

| | |
|---|---:|
| Total Income: | 225,823.44 |
| Total Cost of Goods Sold: | 40,327.73 |
| Gross Profit: | 185,495.71 |
| Total Expenses: | 119,509.92 |
| Net Ordinary Income: | 65,985.79 |
| Total Other Income: | 64.22 |
| Net Income: | 66,050.01 |
| | |
| Total Receipts: | 264,391.77 |
| Total Disbursements: | 189,675.67 |
| Net Cash Flow: | 74,716.10 |

*May 2018*:

| | |
|---|---:|
| Total Income: | 593,094.36 |
| Total Cost of Goods Sold: | 210,899.67 |
| Gross Profit: | 382,194.69 |
| Total Expenses: | 436,131.62 |
| Net Ordinary Income: | (53,936.93) |
| | |
| Total Other Income: | 124.03 |
| Total Other Expense: | 3,634.00 |
| Net Other Income: | (3,590.97) |
| | |
| Net Income: | (57,446.90) |
| | |
| Total Receipts: | 531,696.03 |
| Total Disbursements: | 462,456.34 |
| Net Cash Flow: | 69,239.69 |

*June 2018*:

| | |
|---|---:|
| Total Income: | 463,731.54 |
| Total Cost of Goods Sold: | 171,184.30 |
| Gross Profit: | 292,547.24 |
| Total Expenses: | 304,100.76 |
| Net Ordinary Income: | (11,553.52) |
| Total Other Income: | 84.94 |
| Net Income: | (11,468.58) |
| | |
| Total Receipts: | 478,985.03 |
| Total Disbursements: | 464,308.77 |
| Net Cash Flow: | 14,676.26 |

*July 2018*:

| | |
|---|---:|
| Total Income: | 499,990.52 |
| Total Cost of Goods Sold: | 161,799.21 |
| Gross Profit: | 338,191.31 |
| Total Expenses: | 320,079.37 |
| Net Ordinary Income: | 18,111.94 |
| Total Other Income: | 72.92 |
| Total Other Expense: | 1,350.00 |
| Net Income: | (1,277.08) |
| | |
| Total Receipts: | 531,550.02 |
| Total Disbursements: | 515,765.37 |
| Net Cash Flow: | 15,784.65 |

*August 2018*:

| | |
|---|---:|
| Total Income: | 509,509.29 |
| Total Cost of Goods Sold: | 140,481.06 |
| Gross Profit: | 369,028.23 |
| Total Expenses: | 359,422.91 |
| Net Ordinary Income: | 9,605.32 |
| Total Other Income: | 76.63 |
| Total Other Expense: | 3,905.00 |
| Net Income: | 5,776.95 |
| | |
| Total Receipts: | 506,722.00 |
| Total Disbursements: | 408,466.60 |
| Net Cash Flow: | 98,305.40 |

## II.

### *Debts and Assets Analysis*

#### *A. Assets*

1.    Real Estate:

The Debtor owns the following parcels of real estate: None.

2.    Personal Property:

The amounts listed in Schedule "B" of the Schedules of Assets and Liabilities (filed May 11, 2018) were accurate to the best of the Debtor's knowledge. Accordingly, the Debtor's personal property at the time of the Chapter 11 filing had a value as follows:

| | |
|---|---:|
| Cash | 6,000.00 |
| Huntington Bank Checking Account Ending 0126 | 100,321.61 |
| First Merchants Bank Checking Account Ending 3225 | 227.62 |
| Sub Card Clearing Account – Due from Subway for Subway Cards | 23,982.55 |
| Various utility deposits at 15 stores | 20,908.00 |
| 90 days or less: Charge sales at stores | 1,087.78 |
| Food (perishable) (purchased within 20 days of filing) | 77,924.90 |
| 2018 Toyota Camry (VIN ending 1189) | 30,612.70 |
| Fixed assets: Equipment & Fixtures ($749,386 book), Leasehold Improvements ($377,950 book) | 55,000.00 |
| Franchise Fee | 0.00 |
| Inclusive of Goodwill ($417,417.00), Franchise Fees ($40,816.00), Loan Costs ($122.00) | Unknown |
| Vision Investment Group, Inc. | 0.00 |
| A/R Bill Stose | 4,961.00 |

|  |  |
|---|---|
| A/R Vision Investment Group, Inc. ($516,337) | 0.00 |
| TOTAL: | 321,026.16 |

### *B. Debts*

The following information is a summary of the Debtor's debt obligations pursuant to information as set forth in the Schedules filed in the case. These amounts are presented as an indication of the Debtor's financial status as of the commencement of the case.

1. <u>Secured Creditors</u>:

The following are the creditors scheduled by the Debtor claiming security interests (secured in whole or in part) and the estimated amount of the claim:

| | |
|---|---|
| Bippus State Bank | |
| (Blanket Lien) | $13,773.74 |
| Corporation Service Company, as Rep. | |
| (Blanket Lien) | Unknown |
| Direct Capital | |
| (Point of Sale Systems & Security Surveillance | $54,203.00 |
| Systems & Brookville, OH Store Purchase) | |
| Doctor's Associates Inc. | |
| (Blanket Lien) | $0.00 |
| General Electric Credit Union | |
| (Blanket Lien) | Unknown |
| PNC Bank, N.A. | |
| (Blanket Lien) | Unknown |
| Sigma Restaurants | |
| (Blanket Lien) | $3,750,000.00 |
| Toyota Financial Services | |
| (2018 Toyota Camry (VIN ending 1189) | $32,139.60 |
| U.S. Bank Equipment Finance | |
| (Blanket Lien) | Unknown |
| TOTAL: | $3,850,116.34 |

Although scheduled as creditors by the Debtor, Debtor in review of its records and information regarding claims sets forth the following, additional information:

Bippus State Bank – scheduled by Debtor as secured creditor with a claim amount of $13,773.74. Bippus State Bank has filed proof of claim #2 in the amount of $13,837.33 as a secured claim.

Corporation Service Company – scheduled by Debtor as a secured creditor with a claim amount of "unknown". Debtor scheduled this creditor for notice purposes and no proof of claim has been filed by or on behalf of Corporation Service Company.

Direct Capital – scheduled by Debtor as a secured creditor with a claim amount of $54,203. Direct Capital has filed proof of claim #4 in the amount of $52,008.34.

Doctor's Associates, Inc. – scheduled by Debtor as a secured creditor with a claim amount of $0.00. Debtor scheduled Doctor's Associates, Inc. (the parent company of Subway®) for notice purposes and no proof of claim has been filed by or on behalf of Doctor's Associates.

General Electric Credit Union – scheduled by Debtor as a secured creditor with a claim amount of "unknown". Debtor scheduled General Electric Credit Union for notices purposes and no proof of claim has been filed by or on behalf of General Electric Credit Union.

PNC Bank, N.A. – scheduled by Debtor as a secured creditor with a claim amount of "unknown". Debtor scheduled PNC Bank, N.A. for notices purposes and no proof of claim has been filed by or on behalf of PNC Bank, N.A.

Sigma Restaurants – scheduled by Debtor as a secured creditor with a disputed claim in the amount of $3,750,000.00. Sigma Restaurants has filed proof of claim #7 in the amount of $6,731,332.86 as a secured claim. Debtor does not agree with the amount of the Sigma Restaurants claim, nor its classification as a secured claim. Debtor has filed an adversary proceeding Case No. 18-01067 asserting that Sigma Restaurants did not properly perfect its security interest and accordingly does not have secured claim status. Sigma Restaurants does not agree with the Debtor's assertions in the pending adversary. The adversary proceeding is presently pending in the Bankruptcy Court.

Toyota Financial Services – scheduled by the Debtor as a secured creditor with a claim amount of $32,139.60 secured by a 2018 Toyota Camry vehicle.

U.S. Bank Equipment Finance – scheduled by Debtor as a secured creditor with a claim amount of "unknown". Debtor scheduled U.S. Bank Equipment Finance for notices purposes and no proof of claim has been filed by or on behalf of U.S. Bank Equipment Finance.

2.    Unsecured Creditors:

All creditors of the Debtor not listed above are considered unsecured. The total of all claims listed by the Debtor in its Schedule "F" filed May 11, 2108 as unsecured is $2,829.07.

3.    Priority Claims:

Debtor scheduled a priority claim for sales tax owed to the Ohio Department of Taxation in the amount of $6,823.66; however, the Ohio Department of Taxation Inc. has filed a proof of claim #8 totaling $25,010.00 which asserts a priority claim of $22,010.00 and general unsecured claim of $3,000.00. The Internal Revenue Service has filed a proof of claim #1 asserting a priority claim in the amount of $29,539.24 and general unsecured claim of $700.00.

It is expected that there will be some adjustment to these amounts when exact amounts of claims become known.

### *C. Liquidation Analysis*

The Liquidation Analysis is provided for a comparison of what creditors would receive in a chapter 7 liquidation as opposed to what is provided under the proposed Chapter 11 Plan. In a liquidation, secured creditors are entitled to distribution from proceeds of their collateral prior to distribution to other creditors.

Real Estate:

The Debtor owns no real estate. All of the locations from which the stores are operated are leased.

Personal Property:

Debtor scheduled ownership of personal property that may be classified as follows:

a.      Cash, Bank Accounts, Other Accounts, Utility Deposits
b.      Food Inventory
c.      Equipment and Fixtures
d.      Franchise Fee, Goodwill and Other Intangibles
e.      Accounts Receivable
f.      Vehicle

a.      Cash, Bank Accounts, Other Accounts, Utility Deposits.

Debtor scheduled assets including cash, bank accounts, other accounts and utility deposits as follows:

| | |
|---|---:|
| Cash | 6,000.00 |
| Huntington Bank Checking Account Ending 0126 | 100,321.61 |
| First Merchants Bank Checking Account Ending 3225 | 227.62 |
| Sub Card Clearing Account – Due from Subway for Subway Cards | 23,982.55 |
| Various utility deposits at 15 stores | 20,908.00 |
| 90 days or less: Charge sales at stores | 1,087.78 |
| TOTAL: | 152,527.56 |

In a hypothetical liquidation, the proceeds of the Cash Bank Accounts, Other Accounts and Utility Deposits would be available for distribution to creditors provided, however, presently both Sigma Restaurants and Bippus State Bank assert a lien on assets including intangible assets and accounts as well as proceeds from the sale of assets upon which those creditors assert a lien. The cash and accounts represent proceeds from the sale of inventory which for bankruptcy purposes is defined as cash collateral.

Further, the utility deposits may be considered an intangible asset also subject to a claim of lien by Sigma Restaurants and Bippus State Bank. As above described, see Section II. Part B.,

Debtor has filed a presently pending adversary proceeding asserting that Sigma Restaurants did not properly perfect a lien against the assets of the Debtor. Debtor has not disputed the validity of the lien of Bippus State Bank. Accordingly, in a hypothetical liquidation, if Debtor is successful in its suit against Sigma Restaurants regarding the avoidability of its lien following payment of the Bippus State Bank claim of approximately $13,773.00 the remainder of account proceeds of approximately $140,000.00 would be available for distribution to unsecured creditors. If the claimed lien of Sigma Restaurants is not avoided, then in a hypothetical liquidation, the account proceeds would be paid to Sigma as a secured creditor and there would be no proceeds available for distribution to unsecured creditors.

b.    Food Inventory.

Debtor scheduled food inventory with a value of $77,924.90. In its operation, Debtor maintains just sufficient inventory to daily operate its 15 stores. The food inventory was scheduled with a value at cost. As with the cash and accounts, the food inventory is subject to liens asserted by Sigma Restaurants and Bippus State Bank. However, in a hypothetical liquidation, Debtor sets forth it would not be able to maintain necessary operations for the Subway® franchise stores to allow the sale of existing inventory such that in a liquidation, Debtor does not believe the food inventory would result in liquidation proceeds for creditors and may result in additional liquidation expense associated with any required disposal of remaining, unused food inventory.

c.    Equipment and Fixtures.

Debtor scheduled equipment and fixtures with a scheduled value of $55,000.00. This value was based upon Debtor's opinion of value if the property were to be removed from the stores for sale. Debtor also based this value on the assertion that, because of the markings on the equipment, as well as the specific intended use, it is likely the equipment and fixtures could only be marketed and sold to the operator of a Subway® franchise store. Debtor also considered the age and condition of the equipment in its valuation. The schedules filed also note the book value of the equipment with information noted as follows:

| | | |
|---|---|---|
| Equipment & Fixtures | $749,386.00 | book value |
| Leasehold Improvements | $377,950.00 | book value |

Debtor set forth this information for disclosure purposes and maintains such values reflect acquisition cost and expense incurred in such acquisition and installation of improvements and fixtures. Debtor maintains that the actual sale value, if the equipment had to be sold, would be much closer to the scheduled value of $55,000.00 for the used equipment and fixtures than the book value thereof. In a hypothetical liquidation, the proceeds (less costs of liquidation) would go to Sigma Restaurants if its lien is upheld in the pending adversary proceeding; otherwise, Direct Capital Corporation also has a stated lien interest in Debtor's assets including equipment and other assets securing its claim of $52,008.34. As such, in a liquidation, Debtor maintains that there would be no proceeds in liquidation of the equipment and fixtures available for distribution to unsecured creditors.

d.    Franchise Fee, Goodwill and Other Intangibles.

Debtor scheduled Goodwill, Franchise Fee and Loan Costs with a value of unknown. Debtor scheduled these items as they are reflected on the prepetition balance sheet of the Debtor and for disclosure purposes were identified in the schedules with book values as follows:

| | |
|---|---|
| Goodwill | $417,417.00 |
| Franchise Fee | $40,816.00 |
| Loan Costs | $122.00 |

These items were reflected in Debtor's books resulting from expenses incurred by the Debtor as part of the acquisition from Sigma Restaurants including the Goodwill and Franchise Fees and the loan cost related to Bippus State Bank. In a hypothetical liquidation, the franchise fee expenses and loan costs booked by the Debtor would not constitute saleable assets. The goodwill would be encompassed in a sale of the Subway® stores if the stores were sold as a going concern. As above identified, the Debtor does not own the franchise rights for the stores that are operated by the Debtor. The franchise rights to each of the 15 stores belong to Jim Miller individually in compliance with the franchisor requirement that the franchise rights for a Subway® store must be owned by a natural person. Debtor has only an assignment (through Vision Investment Group, Inc. – Section I. Part H. above) of the right to operate the stores. Accordingly, sale of the right to operate the stores would, Debtor believes, be difficult to achieve inasmuch as the actual franchise rights belong to Jim Miller individually. In the absence of the sale of the franchise rights that are owned by Jim Miller individually, Debtor believes the right to operate only that the Debtor has by way of a verbal understanding from Vision Investment Group, Inc., would likely have little in value in the event of a hypothetical liquidation.

e.    Accounts Receivable.

Debtor scheduled accounts receivable pursuant to its prepetition records information as follows:

| | | |
|---|---|---|
| Accounts Receivable | Bill Stose | $4,961.00 |
| Accounts Receivable | Vision Investment Group, Inc. | $0.00 |
| | Book Value $516,337 | |

The Bill Stose receivable results from prepetition accounts information concerning tax withholding amounts for the year 2015, tax preparation expense incurred related to the business in 2016 and CPA fees in 2017 associated with equity ownerships analysis required. Mr. Stose is a pre-petition equity owner in the business – see Section I. Part G. This amount is believed to be collectible by the Debtor. The receivable regarding Vision Investment Group, Inc. results from bookkeeping entries concerning intercompany transactions including loans regarding that affiliate of the Debtor. These intercompany transactions are identified in accounts information dating from 2016 through April 2018. The majority of the transactions concern allocation of expenses among common vendors by and between the Debtor and Vision Investment and does also include entries for allocation of administrative wages and expenses between the companies. Vision Investment Group, Inc. has filed its own chapter 11 case and Debtor does not believe this amount is collectible.

As such, Debtor valued the receivable at zero based upon the insolvency of Vision Investment. Accordingly, in a hypothetical liquidation, Debtor believes that the Bill Stose receivable of approximately $4,900.00 is collectible, but the receivable regarding Vision Investment would not result in proceeds available for payment to creditors. Proceeds from any collection of accounts receivable would be paid to Sigma Restaurants unless its lien interest is avoided in which case the receivable amount would be avoidable for distribution to unsecured creditors.

f.    Vehicle.

Debtor scheduled a 2018 Toyota Camry vehicle with a scheduled value of $30,612.70 based upon its mileage, age and condition and potential resale value. This vehicle is subject to the lien of Toyota Financial Services in the amount of $32,139.60. Accordingly, in a hypothetical liquidation, the proceeds from the sale of the vehicle would be paid to the secured creditor, Toyota Financial Services on account of its lien interest and there would be no proceeds available for distribution to unsecured creditors.

Summary:

Proceeds in a liquidation given the above values and assumptions would be as follows:

| | |
|---|---|
| Cash, Bank Accounts, Other Accounts, Utility Deposits | $152,527.00 |
| Food Inventory | $0.00 |
| Equipment and Fixtures | $55,000.00 |
| Franchise Fee, Goodwill and Other Intangibles | $0.00 |
| Accounts Receivable | $4,961.00 |
| Vehicle | $0.00 |
| TOTAL: | $212,488.00 |

As above identified, only in the event that the Sigma Restaurants lien were to be avoided, would there be proceeds available for unsecured creditors. Additionally, in a hypothetical liquidation, the Debtor's bankruptcy estate would incur administrative costs in liquidation associated with the appointment of a chapter 7 Trustee. These fees and expenses, including the cost of the Trustee's retention of professionals (e.g. attorneys and accountants) are estimated to be approximately 10 to 20% of the realized liquidation proceeds or approximately $30,000.00. As such, if the Sigma Restaurants lien were to be avoided, following payment of the Bippus State Bank secured claim of approximately $14,000.00 and the Direct Capital secured claim of approximately $52,000.00, given the above amounts, values and assumptions, Debtor estimates that approximately $116,488.00 would be available for payment to unsecured claims.

In a liquidation, certain claims are entitled to priority prior to distribution to general unsecured creditors. These claims consist of administrative and priority claims pursuant to the priorities set forth in the Bankruptcy Code.

Administrative Expenses: Certain entities including Debtor's attorneys, accountants, appraisers, or other professionals authorized to be employed by the Debtor and professionals employed by the Unsecured Creditors' Committee, if any, may file Applications with the

Bankruptcy Court for the allowance of compensation and reimbursement of expenses. Requests for compensation are subject to approval by the Bankruptcy Court after a hearing on notice at which the Debtor and other parties in interest may participate and, if appropriate, object to the allowance of any compensation and reimbursement of expenses. Attorney fees are not known at present, but are estimated to be $145,000.00 at Confirmation. Accountancy fees are not know at present, but are estimated to be $20,000.00 at Confirmation. These amount may be greater or lesser depending upon matters involved in the chapter 11 proceeding, including issues relating to claims and the confirmation of the Plan. Additional administrative expenses would include U.S. Trustee fees unsatisfied at the time of the Plan Confirmation, which at this time are estimated to be $13,500.00. U.S. Trustee fees continue to accrue until the case is closed.

Priority Claims: Certain claims, including certain government taxing authority claims are entitled to a priority position over general unsecured creditors. The Bankruptcy Code requires payment of these priority claims before distribution to general unsecured creditors or interest holders. Proofs of Claim filed to date indicate total priority claims asserted totaling $51,549.24.

Administrative and priority claims (if any) would be entitled to payment prior to payment to general unsecured creditors.

Liquidation Analysis Summary:

Given the above values, assumptions and claim amounts as set forth herein, Debtor sets forth the following liquidation analysis summary:

| | |
|---|---|
| Net liquidation proceeds[1] | $116,488.00 |
| Administrative expenses (estimate) | ($178,500.00) |
| Priority claims | ($51,549.24) |
| | 0 |

Accordingly, Debtor sets forth that in a hypothetical liquidation, the total proceeds available for payment to general unsecured creditors represents an amount less than as proposed to be paid to unsecured creditors under Debtor's chapter 11 plan.

## ***D. Projections***

The Debtor has in accordance with its experience and expertise, formulated projections of income and expenses for the continued operation of the corporation.

These projections, based upon the Debtor's most current information reflect the present opinion of the income to be generated by the operation of Trinity Investment Group LLC, as well as the costs and expenses associated with its operation.

---

[1] Following payment of Bippus State Bank and Direct Capital secured claims, but presuming the avoidability of the Sigma Restaurants' asserted lien. If the Sigma Restaurants lien is not avoided, such proceeds would be available for application to the Sigma Restaurants claim as may be allowed.

The projections, attached hereto as **Exhibit A**, provide information on the continued operation of the Debtor based upon its experience and current information and opinion regarding anticipated sales income and expenses from the operation of the business. It is cautioned that no representation can be made with respect to the accuracy of these projections or the ability to achieve the projected results. Certain of the business assumptions used in the preparation of the projections may not materialize. The conclusions described herein are subject to numerous assumptions regarding future sales, costs of supplies and expenses associated with the operation of the business. Moreover, unanticipated and uncontrollable events and circumstances may occur after the date of the forecast which would affect the business and operation of Trinity Investment Group LLC. Accordingly, although the Debtor believes that these projected results are achievable, actual results achieved during the period covered by the projections will undoubtedly vary from the projections and such variations may be material. The financial information set forth herewith should be reviewed in conjunction with other information regarding the Debtor's business and operation and with such other information contained elsewhere in this Disclosure Statement.

## III.

### *Bankruptcy Code Requirements for Confirmation*

The Bankruptcy Court will confirm the Plan only if it finds that all of the requirements of §1129 (Confirmation of plan) of the Bankruptcy Code are met. Among the requirements for confirmation of a Plan are that the Plan: (i) is accepted by all impaired classes of claims and equity interests, or if rejected or deemed rejected by an impaired Class, satisfies the "cramdown" standard; (ii) is feasible; and (iii) is in the "best interests" of creditors and stockholders (interest holders) impaired under the Plan.

Section 1129 of the Bankruptcy Code which sets forth the requirements that must be satisfied in order for the Plan to be confirmed, lists the following requirements for the approval of any plan of reorganization:

1.      A plan must comply with the applicable provisions of the Bankruptcy Code.

2.      The proponent of a plan must comply with the applicable provisions of the Bankruptcy Code.

3.      A plan must be proposed in good faith and not by any means forbidden by law.

4.      Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under a plan, for services or for costs and expenses in or in connection with the case, or in connection with such plan and incident to the case, must be approved by, or be subject to the approval of, the court as reasonable.

5.      (i)(A)      The proponent of a plan must disclose the identity and affiliations of any individual proposed to serve, after confirmation of such

plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a joint plan and the Debtor, or a successor to the Debtor under such plan; and

(B)     The appointment to, or continuance in, such office of such individual, must be consistent with the interests of creditors and equity security holders and with public policy; and

(ii)     The proponent of a plan must disclose the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for each insider.

6.     Any governmental, regulatory commission with jurisdiction, after confirmation of a plan, over the rates of the debtor must approve any rate change provided for in such plan, or such rate change is expressly conditioned on such approval.

7.     Each holder of a claim or interest in an impaired class of claims or interests must have accepted the plan or must receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date, or, if the class is a class of secured claims that elects non-recourse treatment of the claims under §1111(b) of the Bankruptcy Code (§1111 is entitled "Claims and interests"), each holder of a claim in such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims. This is the so-called "best interests" test.

8.     With respect to each class of claims or interests, such class must accept the plan or not be impaired under the plan (subject to the "cramdown" provisions discussed herein.)

9.     Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, a plan must provide that:

(i)     with respect to an administrative claim and certain claims arising in an involuntary case, on the effective date of the plan, the holder of the claim will receive on account of such claim cash equal to the allowed amount of the claim;

(ii)     with respect to a class of priority wage, employee benefit, consumer deposit and certain other claims described in §507(a)(3)-(6) of the Bankruptcy Code (§507 is entitled "Priorities"), each holder of a claim of such class will receive

(A)    if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(B)    if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

(iii)    with respect to a priority tax claim of a kind specified in §507(a)(8) of the Bankruptcy Code, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding five (5) years after the date of the order for relief, of a value, as of the date of assessment of such claim of a value, as of the effective date of the plan equal to the allowed amount of such claim, and such treatment must be in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plain (other than cash payments made to a class of creditors under §1122(b)). (§1122 is entitled "Classification of Claims or interests")

10.    If a class of claims is impaired under a plan, at least one class of claims that is impaired under such plan must have accepted the plan, determined without including any acceptance of the plan by any insider; except that in a case in which the debtor is an individual, the debtor may retain property included in the estate subject to the requirements of 11 U.S.C. §1129(a)(14) described in ¶15 below.

11.    Confirmation of a plan must not be likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan unless such liquidation or reorganization is proposed in the plan. This is the so-called "feasibility" requirement.

12.    All fees payable under §330 of the Bankruptcy Code, as determined by the court at the hearing on confirmation of the plan, must have been paid or the plan must provide for the payment of all such fees on the effective date of the plan.

13.    A plan must provide for the continuation after its effective date of payment of all retiree benefits, as that term is defined in §1114 (Payment of insurance benefits to retired employees) of the Bankruptcy Code, at the level established pursuant to either subsection (e)(1)(B) or (g) of §1114 of the Bankruptcy Code, at any time prior to confirmation of such plan, for the duration of the period the debtor has obligated itself to provide such benefits.

14.     An individual debtor may not obtain confirmation unless post-petition domestic support obligations are paid in full.

15.     In those chapter 11 cases in which the debtor is an individual, and in which the holder of an allowed unsecured claim objects to the confirmation of the Plan, the court will confirm the Plan only if the value, as of the effective date of the Plan, of the property to be distributed under the Plan on account of such claim is not less than the amount of such claim; or the value of the property to be distributed under the Plan is not less than the projected disposable income of the debtor (as defined in 11 U.S.C. §1325(b)(2) to be received during the five (5) year period beginning on the date that the first payment is due under the Plan, or during the period for which the Plan provides payments, whichever is longer.

This Disclosure Statement discusses three of these requirements: (a) the feasibility of the Plan; (b) acceptance by impaired classes; and (c) the "best interests" standard. The Debtor believes that the Plan meets all the requirements of §1129(a) of the Bankruptcy Code (other than as to voting, which has not taken place) and will seek a ruling of the Court to this effect at the hearing on confirmation of the Plan. You are urged to consult your own attorneys to evaluate each of the standards for confirmation of the Plan under the Bankruptcy Code.

### _Vote Required for Acceptance; Confirmation_

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots (other than any holders who are found by the Bankruptcy Court to have cast their ballots in bad faith). The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots other than any holders who are found by the Bankruptcy Court to have cast their ballots in bad faith.

In addition to this voting requirement, §1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found by the Court to be in the best interests of each holder of a claim or interest in an impaired class. See "Best Interests Test" below.

If one Class of impaired Claims or Interests accepts the Plan, the Court may confirm the Plan under the "cramdown" provisions of §1129(b) of the Bankruptcy Code, which permits the confirmation of a plan over the dissenting votes of creditors or equity interest holders that have voted, as a Class, to reject the plan, provided that certain standards are met. See "Cramdown" below.

In the event any Voting Class votes against the Plan, and the Plan is not withdrawn, the terms of the Plan may be modified by the Debtor, as necessary to effect a "cramdown" on such dissenting Class or Classes by reallocating value from all Classes Junior to the objecting Class or Classes to any impaired senior Classes until such impaired senior Classes are paid in accordance

with the absolute priority rule of §1129(b) of the Bankruptcy Code. Any such modifications or amendments shall be filed with the Bankruptcy Court and served on all parties in interest entitled to receive notice of the hearing on the confirmation of the affected Plan. Subject to the conditions set forth in the Plan, a determination by the Bankruptcy Court that the Plan is not confirmable pursuant to §1129 of the Bankruptcy Code will not limit or affect the Debtor's ability to modify the Plan to satisfy the provisions of §1129 of the Bankruptcy Code.

### *Best Interests Test*

Notwithstanding acceptance of the Plan by each impaired Class, in order to confirm the Plan the Bankruptcy Court must determine that the Plan is in the best interests of each Holder of a Claim or Interest that has not accepted the Plan. Accordingly, if an impaired Class does not unanimously accept the Plan, the "best interests" test of §1129(a)(7) of the Bankruptcy Code requires that the Court find that the Plan provides to each Holder of a claim or interest in such impaired Class a recovery on account of the Holder's Claim or Interest that has a value of at least equal to the value of the Distribution that each such Holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

To estimate what members of each impaired Class of Claims or Interests would receive if the Debtor were liquidated in a chapter 7 case, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if the Debtor's case were converted to a chapter 7 liquidation by a chapter 7 trustee (the "Liquidation Value"). The Liquidation Value would consist of the net proceeds from the disposition of the assets of the Debtor, augmented by the Cash held by the Debtor and reduced by certain increased costs and Claims that arise in a chapter 7 liquidation case that do not arise in a chapter 11 reorganization case including sale costs. Debtor believes that a chapter 7 liquidation would have a material and adverse effect upon the values which would be received by its creditors when measured against such values assuming consummation of the Plan.

The Liquidation Value available to general creditor would be reduced by: (a) the Claims of secured creditors to the extent of the value of their collateral; and (b) the costs and expenses of the liquidation under chapter 7, which would include: (i) the compensation of a trustee and its counsel and other professionals retained; (ii) disposition expenses; (iii) all unpaid expenses incurred by the Debtor during its Reorganization Case (such as compensation for attorneys, auctioneers and accountants) which are allowed in the chapter 7 case; (iv) litigation costs; and (v) Claims arising from the operation of the Debtor during the pendency of the chapter 11 and chapter 7 liquidation cases. The liquidation itself would cause the realization of additional Priority Claims and would accelerate other priority payments which would otherwise be payable in the ordinary course. These Priority Claims would be paid in full out of the liquidation proceeds before the balance would be made available to pay most other Claims or to make any Distribution in respect of Interests. A discussion concerning liquidation of the Debtor's assets is set forth above, See II.C. Liquidation Analysis.

Once the percentage liquidation recoveries for each Class are ascertained, the value of the Distribution available out of the Liquidation Value is compared with the value of the property offered to such Class under the Plan to determine if it is in the best interests of Holders of Allowed Claims or Allowed Interests, as the case may be, in such Class.

After considering the effect that a chapter 7 liquidation would have on the value of the Debtor, including the costs of an Claims resulting from a chapter 7 liquidation, the adverse effect of a forced sale on the prices of the Debtor's assets, the potentially adverse impact on the Debtor's business and the delay in the distribution of liquidation proceeds, the Debtor has determined estimated Liquidation Values for its Reorganization Case, which are set forth above. Based on the analysis set forth therein, and subject to the assumptions and qualifications therein expressed, the Debtor believes that the Plan as proposed herein satisfies the requirements of the "best interests" test of §1129(a)(7) of the Bankruptcy Code.

## *Fair and Equitable Test; Cramdown*

Any Voting Class that fails to accept the Plan will be deemed to have rejected the Plan. Notwithstanding such rejections, the Bankruptcy Court may confirm the Plan and the Plan will be binding upon all Classes, including the Classes rejecting the Plan, if the Debtor demonstrates to the Bankruptcy Court that at least one impaired Class of Claims has accepted the Plan and that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each non-accepting Class. A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are similar to those of the dissenting class and if no class receives more than it is entitled to for its claims or interests.

The Bankruptcy Code establishes different "fair and equitable" tests for the secured and unsecured creditors as follows:

1.    Secured Creditors. Either (i) each secured creditor in a non-accepting impaired class retains the liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each secured creditor in a non-accepting impaired class realizes the indubitable equivalent of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this subparagraph.

2.    Unsecured Creditors. Either (i) each unsecured creditor in a non-accepting impaired class receives or retains under the plan property having a present value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the Plan, unless new value is given by and through the operation of the Chapter 11 Plan; additionally, with respect to those cases in which the Debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the Plan, the court will confirm the Plan only if the value, as of the effective date of the Plan, of the property to be distributed under the Plan on account of such claim is not less than the amount of such claim; or the value of the property to be distributed under the Plan is not less than the projected disposable

income of the debtor (as defined in 11 U.S.C. §1325(b)(2) to be received during the five (5) year period beginning on the date that the first payment is due under the Plan, or during the period for which the Plan provides payments, whichever is longer.

THE DEBTOR BELIEVES THAT THE PLAN DOES NOT DISCRIMINATE UNFAIRLY WITH RESPECT TO ANY CLASS AND IS FAIR AND EQUITABLE WITH RESPECT TO EACH IMPAIRED CLASS, THEREFORE, THE DEBTOR INTENDS TO SEEK CONFIRMATION OF THE PLAN EVEN IF LESS THAN THE REQUISITE NUMBER OF FAVORABLE VOTES ARE OBTAINED FROM ANY VOTING CLASS.

### *Feasibility*

The Bankruptcy Code requires that the Bankruptcy Court, in order to confirm the Plan must find that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor (the "Feasibility Test"). For the Plan to meet the Feasibility Test, the Bankruptcy Court must find that reorganized Debtor, subsequent to the Effective Date, will have a reasonable expectation of generating, through their own operations or access to sources of debt and/or equity capital, funds sufficient to satisfy their obligations under the Plan and otherwise.

Assuming consummation of the Plan substantially as described herein, the Debtor believes that the Plan meets the requirements of the Feasibility Test. The Debtor has prepared projections of the expected operating and financial results of reorganized Debtor for a period of three (3) years. Based on those projections, Debtor believes that the Plan complies with the financial feasibility standard for confirmation. The Debtor believes the results set forth in these projections are attainable and that it will have sufficient funds to meet its obligations under the Plan and otherwise.

The Debtor cautions that no representations can be made with respect to the accuracy of these projections or the ability to achieve the projected results. Certain of the business assumptions used in the preparation of the Projections may not materialize. The conclusions described herein are subject to numerous assumptions regarding continuing operations, many of which are the subject of continuing review and modification. Moreover, unanticipated and uncontrollable events and circumstances may occur after the date of the forecasts which could affect the business and property. Accordingly, although the Debtor believes that these projected results are achievable, actual results achieved during the period covered by the Projections will undoubtedly vary from the Projections, and such variations may be material.

### IV.

### *Legal Effect of Plan Confirmation*

1.     <u>As to Cases Other than Individual Debtors</u>. In cases in which the Debtor is not an individual, except as otherwise provided in the Plan or Confirmation Order, in accordance with §1141(d)(1) of the Bankruptcy Code (§1141 is entitled "Effect of confirmation"), entry of the Confirmation Order acts as a discharge effective as of the effective date of all debts of, claims

against, liens on, and interest in the Debtor, its assets or properties which debts, claims, liens and interest arose at any time before the entry of the Confirmation Order.

2. <u>As to cases in which Debtor is an Individual</u>. Unless after notice and hearing the Court orders otherwise for cause, confirmation of an individual Debtor's Chapter 11 Plan does not discharge any debt provided for in the Plan until the Court grants a discharge on completion of all payments under the Plan under 11 U.S.C. §1141(d)(5)(A) except that the Court may grant a discharge prior to Plan completion under sub-part (b) of that Section if there exists a lack of practical ability to modify the confirmed Plan and the distribution of all property under the Plan is no less than unsecured creditors would have received in a chapter 7 liquidation.

3. <u>Scope of Discharge</u>. The discharge of the Debtor shall be effective as to each claim, regardless of whether a Proof of Claim therefor was filed, whether the claim is an allowed claim or whether the holder thereof votes to accept the Plan. On the effective date as to every discharge claim and interest any holder of such claim or interest shall be precluded from asserting against the reorganized Debtor or against *their* respective assets or properties any other or further claim or interest based upon any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the Confirmation date. Further, any holder of a claim or interest shall be precluded from asserting the same against the Debtor or the reorganized Debtor, except as specifically provided for in the Plan.

4. <u>Injunction</u>. In accordance with §524 ("Effect of discharge") of the Bankruptcy Code, the discharge provided by the Plan and §1141 of the Bankruptcy Code, <u>inter alia</u> acts as an injunction against the commencement or continuation of any action, employment of process or act to collect, offset or recover the claims discharged hereby.

5. <u>Applicability</u>. Except as otherwise may be set forth in the Plan, the discharge provisions of the Plan do not apply to rights, claims or causes of action whether asserted or yet to be asserted against a non-Debtor except that no rights, claims or causes of action against Debtor can be asserted against the Debtor or reorganized Debtor.

6. <u>Retention of Claims</u>. Except as otherwise provided in the Plan including without limitation any contract, instrument, release or other agreement entered into in connection with the Plan or by Order of the Bankruptcy Court in accordance with §1123(b) of the Bankruptcy Code (§1123 is entitled "Contents of plan"), the reorganized Debtor shall retain and may enforce any claims, rights and causes of action that the Debtor or their estate may hold including without limitation any claims, rights or causes of action under §544 through §550 inclusive of the Bankruptcy Code (these Bankruptcy Code sections set forth avoidance powers of a trustee) or any other applicable law. After the effective date, reorganized Debtor may pursue any such claims, rights and causes of action in accordance with what is in their best interest.

7. <u>Revesting and Vesting</u>. Except as otherwise provided expressly in the Plan, on the effective date, all property comprising the estate of the Debtor shall revest in reorganized Debtor and shall become property of the reorganized Debtor free and clear of all claims, liens, charges, encumbrances and interests of creditors and equity security holders (other than as expressly provided in the Plan). As of the effective date reorganized Debtor shall operate the business and

use, acquire and dispose of property including any post-petition cash collateral and settle or compromise claims or interests without supervision of the Court free of any restrictions of the Bankruptcy Code or Bankruptcy Rules other than those restrictions expressly imposed by the Plan and Confirmation Order.

8.    <u>Retention of Jurisdiction by the Bankruptcy Court</u>. Notwithstanding Confirmation of the Plan or occurrence of the effective date, the Court shall retain jurisdiction over the reorganization case. Prior to the entry of a Final Order pursuant to Bankruptcy Rule 3022, the Bankruptcy Court shall retain jurisdiction:

a.    Over all claims against or interests in the Debtor;

b.    To determine the allocability of claims and interests upon objection to such claims by the Debtor or reorganized Debtor or the Creditors' Committee;

c.    To determine any tax liability pursuant to §505 (Determination of tax liability) of the Bankruptcy Code;

d.    To adjudicate any dispute under any executory lease or contract assumed during the reorganization case pursuant to §365 (Executory contracts and unexpired leases) of the Bankruptcy Code;

e.    To resolve all matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease of the Debtor;

f.    To determine requests for payment of administrative claims;

g.    To resolve controversies and disputes regarding the interpretation of the Plan including the determination of the priorities of distribution required by the Articles of the Plan.

h.    To implement the provisions of the Plan and enter orders in aid of Confirmation in consummation of the Plan including without limitation, appropriate orders to enforce the right, title and powers of reorganized Debtor from actions by holders of claims against or interests in the Debtor;

i.    To determine classification voting treatment allowance estimation withdrawal disallowance or reconsideration of claims and interests and any objections relating thereto;

j.    To fix, liquidate or estimate claims or interests;

k.    To modify the Plan pursuant to §1127 (Modification of plan) of the

Bankruptcy Code;

l.     To correct any defect, to cure any mistake or omission or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary or appropriate to carry out the purposes and intent of the Plan;

m.    To adjudicate any causes of action that arose prior to the Confirmation date or in connection with the implementation of the Plan including avoidance actions brought by the Debtor or reorganized Debtor as the representation of Debtor's estate or party in interest (as a representative of the Debtor's estate);

n.     To resolve disputes concerning any disputed claims reserve or the administration thereof and claims for disputed distribution;

o.     To resolve any disputes concerning any release of the Debtor under the Plan or the injunction against acts of employment of process, or actions against the Debtor arising under the Plan;

p.     To resolve any disputes concerning whether a personal entity had sufficient notice of the reorganization case, the applicable claims bar date, the hearing on the approval of the disclosure statement as containing adequate information, the hearing on the Confirmation of the Plan for the purpose of determining whether a claim of interest is discharged under the Plan or for any other purpose;

q.     To order the removal pursuant to §1452 (Removal of claims related to bankruptcy cases) of Title 28 of the United States Code of any suit instituted against the Debtor, the estate, the reorganized Debtor or any person released pursuant to the Plan and to hear and determine any action so removed;

r.     To enter a Final order closing the reorganization case; and

s.     To hear and determine such other matters as may be provided for under Title 28 or any other title of the United States Code and any reference to the Bankruptcy Code, the Bankruptcy Code, the Bankruptcy Rules, other applicable law, the Plan or the Confirmation Order.

## V.

### *Summary of the Plan*

The Classes created by the Plan and their respective treatment are summarized below. The obligations under the Plan may be reduced to promissory notes within approximately six (6) months from the date of Confirmation of the Plan. The terms of such promissory notes shall not vary the terms of the Plan.

1.      *Class 1* will constitute holders of administrative expenses claims, including Debtor's attorneys. This Class will be paid in full within thirty (30) days after Confirmation unless earlier payment is authorized by the Court. The U.S. Trustee fees shall be paid in full in timely fashion pursuant to the quarterly fee payments schedule until such time as this chapter 11 case is closed. This Class is not impaired.

2.      *Class 2* will consist of the Bippus State Bank Allowed Secured Claim. The Allowed Secured Claim of this Class shall be paid in full, With Interest. Payment shall be in monthly installments of $1,000.00 each, commencing thirty (30) days after Confirmation of the Plan and continuing until the Allowed Secured Claim of this Class is paid in full. The security interest of this Class shall continue in effect. This Class is impaired.

3.      *Class 3* will consist of the Sigma Restaurants, Inc. Allowed Secured Claim. The Allowed Secured Claim of this Class, if any, shall be paid in full, With Interest. To the extent this Class is determined to have a secured claim by the Court in Adversary Proceeding Case No. 18-01067, the Allowed Secured Claim amount shall be deemed to be $222,867.70 unless this Class objects to such valuation in writing to the Debtor and its counsel on or prior to the date objections are due on the confirmation of the Plan. The Court shall retain jurisdiction to determine the amount of the Allowed Secured Claim (i.e., value of the collateral and resulting value of the security interest based upon its priority) of this Class.

Payment of the Allowed Secured Claim amount shall be paid, With Interest, in monthly installments based upon a five (5) year amortization. Said monthly payments shall commence thirty (30) days after the Effective Date. The monthly payments to this Class based upon the full amount stated above would be $4,308.66. This Class is impaired.

The security interest of this Class, if any is determined to exist by the Court, shall continue as security for the amount of the Allowed Secured Claim under the Plan. The deficiency claim of this creditor, if any, shall be included in, and administered with, Class 8 Unsecured Claims.

4.      *Class 4* will consist of the U.S. Bank, N.A. d/b/a U.S. Bank Equipment Finance Allowed Secured Claim. Pursuant to the Proof of Claim filed by this Class (Claims Docket Proof of Claim No. 3), the Allowed Secured Claim of this Class shall be deemed to be $1,700.00. The said Allowed Secured Claim shall be paid in full, With Interest, in two (2) semi-annual installments commencing with the first installment which shall be due thirty (30) days after Confirmation of the Plan. The security interest of this Class shall continue in effect until the said Allowed Secured Claim of this Class has been paid in full. The deficiency claim of U.S. Bank Equipment Finance shall be included in, and administered with, Class 8 Unsecured Claims.

5.      *Class 5* will consist of the Direct Capital Corporation Allowed Secured Claim. Pursuant to the Proof of Claim filed by this Class (Claims Docket Proof of Claim No. 4), the

Allowed Secured Claim of this Class shall be deemed to be $52,008.43. The said Allowed Secured Claim shall be paid in full, With Interest. Payments shall be in monthly installments based upon a three (3) year amortization and shall commence thirty (30) days after the Effective Date. The security interest of this Class shall continue in effect upon Confirmation of the Plan. The monthly payments to this Class are $1,582.20. This Class is impaired.

6.    **_Class 6_** will consist of the Toyota Financial Services Allowed Secured Claim. The Allowed Secured Claim of this Class, secured by one (1) 2018 Toyota Camry, VIN Ending 1189, shall be paid in full pursuant to the terms of the prepetition agreement of the parties. Provided, however, that any pre-Confirmation default charges shall deemed to be waived and any pre-Confirmation payment defaults shall be cured within thirty (30) days after Confirmation of the Plan without default charges.

7.    **_Class 7_** will consist of Priority Tax Claims. This Class shall be paid in full, with interest accruing from and after Confirmation at the I.R.C. Rate in effect as of Confirmation of the Plan. Payments shall be on a quarterly basis based upon a five (5) year, straight amortization. The first quarterly installment shall be due ninety (90) days after Confirmation. The Debtor believes there will be no allowed claims in this Class.

8.    **_Class 8_** will consist of Unsecured Claims. This Class shall include all creditor claims which are not specifically included in Classes 1 through 7. For clarity and not by way of limitation, this Class shall also include the deficiency claim of U.S. Bank, N.A. d/b/a U.S. Bank Equipment Finance, the deficiency claim, if any, of Sigma Restaurants, Inc., and all Rejection Claims. This Class shall neither have nor retain any liens.

The Allowed Claims of this Class shall be paid on a pro rata basis the sum of $250,000.00 plus the amount of the $222,867.70 Class 3 principal payment which is not paid to that Class due to a determination that such Class is not a secured creditor in this chapter 11 case. No creditor in this Class shall be paid more than its Allowed Claim.

The aforesaid amounts payable to this Class shall be With Interest and shall be made in prorated monthly installments based upon a five (5) year amortization commencing with the first monthly payment thirty (30) days after Confirmation of the Plan. Provided, however, that such monthly payments may be delayed pending a conclusion on the Debtor's Objections to the Proofs of Claim filed by Sigma Restaurants, Inc. and the determination of the amount, if any, of its Class 8 Claim.

9.    **_Class 9_** will consist of the interest holders. All pre-petition equity security interests of Debtor shall be canceled. One hundred percent (100%) of the membership interest in the reorganized Debtor shall be distributed to James E. Miller, II for the consideration set forth in Article IV. of the Plan.

THE FOREGING IS A BRIEF SUMMARY OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES. CREDITORS ARE FURTHER URGED TO CONSULT WITH COUNSEL, OR WITH EACH OTHER, IN ORDER TO FULLY UNDERSTAND THE PLAN.

******** 

ADDITIONALLY, ANY CREDITOR DESIRING INFORMATION REGARDING THE DEBTOR THAT SUCH CREDITOR BELIEVES IS NOT SUPPLIED BY THE DISCLOSURE STATEMENT IS REQUESTED TO CONTACT THE ATTORNEYS FOR THE DEBTOR.

TRINITY INVESTMENT GROUP LLC

/s/ James E. Miller, II
James E. Miller, II, President

## <u>CERTFICATE OF SERVICE</u>

The undersigned, who is duly admitted to practice in the State of Indiana and before the Court, hereby certifies that a copy of the above and foregoing was transmitted electronically through the Bankruptcy Court's ECF System, on October 11, 2018, to the following:

Leonard W. Copeland
Nancy J. Gargula
Office of the United States Trustee
One Michiana Square, Suite 555
100 E. Wayne Street
South Bend, IN 46601

Adrian L. Halverstadt III
DeLANEY HARTBURG ROTH
 & GARROTT LLP
533 Warren Street
P.O. Box 269
Huntington, IN 46750
Attorney for Bippus State Bank

Daniel A. Cox
WOOD & LAMPING LLP
600 Vine Street, Suite 2500
Cincinnati, OH 45202
Attorney for General Electric Credit Union

Norman A. Abood
101 Broadcast Building
136 N. Huron Street
Toledo, OH 43604-1139
Attorney for Sigma Restaurants, Inc.

The undersigned further certifies that a copy of the above and foregoing was sent by first class United States mail, postage prepaid on October 11, 2018, to the following:

Trinity Investment Group LLC
c/o James E. Miller, II, President
P.O. Box 495
Bluffton, IN 46714

/s/ Scot T. Skekloff
Scot T. Skekloff (#15849-02)

6 period budget 061018

| | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | P8; 07/11/18-08/07/18 | P9; 08/08/18-09/04/18 | P10; 09/05/18-10/02/18 | P11; 10/03/18-10/30/18 | P12: 10/31/18-11/27/18 | P13: 11/28/18-12/25/18 | 19P1: 12/26/18-01/22/19 | 19P2: 01/23/19-2/19/19 | 19P3: 02/20/19-3/19/19 | 19P4: 03/20/19-4/16/19 | 19P5: 04/17/19-5/14/19 | 19P6: 05/15/19-6/11/19 | 19P7: 06/12/19-7/09/19 | Total 13 periods 18P8 - 19P7 | % net sales w/o tax |
| | (a) Cash Sales & Credit Card Receipts | $2,677,843.29 | $449,294.07 | $415,910.65 | $453,637.11 | $402,886.54 | 458,900 | 421,400 | 424,800 | 447,200 | 504,600 | 476,400 | 518,125 | 514,056 | 511,556 | $5,998,765 | |
| | (b) Sales Taxes Collected | | $5,537.55 | $5,126.10 | $5,591.08 | $4,965.58 | 5,656 | 5,194 | 5,236 | 5,512 | 6,219 | 5,872 | 6,386 | 6,336 | 6,305 | $73,935 | |
| | (c) Less Discounts | | | | | | (38,548) | (35,398) | (35,683) | (37,565) | (42,386) | (40,018) | (43,523) | (43,181) | (42,971) | -$359,271 | 0.064 |
| | Income | | $454,831.62 | $421,036.75 | $459,228.19 | $407,852.12 | $426,008 | $391,196 | $394,352 | $415,147 | $468,433 | $442,254 | $480,988 | $477,211 | $474,890 | $5,713,429 | |
| | 4. Expenses | | | | | | | | | | | | | | | | |
| a | Cost of Goods Sold | 33.60% | $151,881.40 | $140,577.80 | $153,329.34 | $136,175.65 | 142,079 | 130,469 | 131,521 | 138,457 | 156,228 | 147,497 | 160,416 | 159,156 | 158,382 | $1,906,149 | 33.8% |
| | COGS Rebate (2017 $ rounded) | | | -$18,000.00 | | | | (54,000) | | | | | | | | -$72,000 | -1.3% |
| b | Gross Wages | 30.00% | $134,788.22 | $124,773.20 | $136,091.13 | $120,865.96 | 126,106 | 115,801 | 116,735 | 122,891 | 138,664 | 130,915 | 142,381 | 141,263 | 140,576 | $1,691,848 | 30.0% |
| c | Payroll Taxes | 8.30% | $11,187.42 | $10,356.18 | $11,295.56 | $10,031.87 | 10,467 | 9,611 | 9,689 | 10,200 | 11,509 | 10,866 | 11,818 | 11,725 | 11,668 | $140,423 | 2.5% |
| d | Background Check Expense | | $10.00 | $10.00 | $10.00 | $10.00 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | $130 | 0.0% |
| e | Rent & Real Estate Taxes | | $26,519.82 | $26,519.82 | $26,519.82 | $26,519.82 | 26,520 | 26,520 | 26,520 | 26,520 | 26,520 | 26,520 | 26,520 | 26,520 | 26,520 | $344,758 | 6.1% |
| f | Rent & Real Estate Taxes Cure Payment [APRIL] | | $23,415.17 | $0.00 | $0.00 | $0.00 | | | | | | | | | | $23,415 | 0.4% |
| g | Insurance-CAM | | $21.00 | $21.00 | $21.00 | $21.00 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | $273 | 0.0% |
| h | Insurance-CAM Cure Payment [APRIL] | | $525.67 | $0.00 | $0.00 | $0.00 | | | | | | | | | | $526 | 0.0% |
| j | CAM Charges | | $6,592.50 | $6,592.50 | $6,592.50 | $6,592.50 | 6,593 | 6,593 | 6,593 | 6,593 | 6,593 | 6,593 | 6,593 | 6,593 | 6,593 | $85,703 | 1.5% |
| k | CAM Charges Cure Payment [APRIL] | | $2,880.50 | $0.00 | $0.00 | $0.00 | | | | | | | | | | $2,881 | 0.1% |
| l | Computer/Security/Network Expense | | $183.33 | $183.33 | $183.33 | $183.33 | 183 | 183 | 183 | 183 | 183 | 183 | 183 | 183 | 183 | $2,383 | 0.0% |
| m | Operating Supplies | 0.50% | $2,246.47 | $2,079.55 | $2,268.19 | $2,014.43 | 2,102 | 1,930 | 1,946 | 2,048 | 2,311 | 2,182 | 2,373 | 2,354 | 2,343 | $28,197 | 0.5% |
| n | Laundry/Air Freshener | | $489.00 | $489.00 | $489.00 | $489.00 | 489 | 489 | 489 | 489 | 489 | 489 | 489 | 489 | 489 | $6,357 | 0.1% |
| o | Office Supplies | | $477.69 | $477.69 | $477.69 | $477.69 | 478 | 478 | 478 | 478 | 478 | 478 | 478 | 478 | 478 | $6,210 | 0.1% |
| p | Advertising - FAF | 4.50% | $20,218.23 | $18,715.98 | $20,413.67 | $18,129.89 | 18,916 | 17,370 | 17,510 | 18,434 | 20,800 | 19,637 | 21,357 | 21,189 | 21,086 | $253,777 | 4.5% |
| q | Advertising - Other | | $0.00 | $0.00 | $0.00 | $0.00 | | | | | | | | | | $0 | 0.0% |
| r | Bank Charges | | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | $26,000 | 0.5% |
| s | Credit Card Process Fees | 1.40% | $6,290.12 | $5,822.75 | $6,350.92 | $5,640.41 | 5,885 | 5,404 | 5,448 | 5,735 | 6,471 | 6,109 | 6,644 | 6,592 | 6,560 | $78,953 | 1.4% |
| t | Cash (SUB/LOYALTY) Card Processing Fees | 0.10% | $449.29 | $415.91 | $453.64 | $902.89 | 420 | 386 | 389 | 410 | 462 | 436 | 475 | 471 | 469 | $6,139 | 0.1% |
| u | PayPal Fees | | $5.00 | $5.00 | $5.00 | $5.00 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | $65 | 0.0% |
| v | Catering Call Center Fee | | $53.85 | $53.85 | $53.85 | $53.85 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | $700 | 0.0% |
| w | Transportation Expense | | $3,692.31 | $3,692.31 | $3,692.31 | $3,692.31 | 3,692 | 3,692 | 3,692 | 3,692 | 3,692 | 3,692 | 3,692 | 3,692 | 3,692 | $48,000 | 0.9% |
| x | Repairs & Maintenance-External Labor | | $200.00 | $200.00 | $200.00 | $200.00 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | $2,600 | 0.0% |
| y | Repairs & Maintenance-Materials | | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | $35,000 | 0.6% |
| | Repairs & Maintenance-Other | | $0.00 | $0.00 | $0.00 | $0.00 | | | | | | | | | | $0 | 0.0% |
| z | Repairs & Maintenance-External Landscaping | | $137.00 | $137.00 | $137.00 | $137.00 | 137 | 137 | 137 | 137 | 137 | 137 | 137 | 137 | 137 | $1,781 | 0.0% |
| aa | Payroll Processing Fees | | $674.77 | $674.77 | $674.77 | $674.77 | 675 | 675 | 675 | 675 | 675 | 675 | 675 | 675 | 675 | $8,772 | 0.2% |
| ab | Pest Control | | $300.00 | $0.00 | $0.00 | $300.00 | | | 300 | | | 300 | | | | $1,200 | 0.0% |
| ac | Postage | | $244.23 | $244.23 | $244.23 | $244.23 | 245 | 245 | 245 | 245 | 245 | 245 | 245 | 245 | 245 | $3,182 | 0.1% |
| ad | Telephone/Internet | | $1,678.77 | $1,678.77 | $1,678.77 | $1,678.77 | 1,679 | 1,679 | 1,679 | 1,679 | 1,679 | 1,679 | 1,679 | 1,679 | 1,679 | $21,824 | 0.4% |
| ae | TV/Music-Stores | | $540.00 | $0.00 | $540.00 | $0.00 | 540 | - | 540 | - | 540 | - | 540 | | | $3,240 | 0.1% |
| af | Utilities - Electric | | $8,230.77 | $8,230.77 | $8,230.77 | $8,230.77 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | $109,423 | 1.9% |
| ag | Utilities - Gas | | $569.38 | $569.38 | $569.38 | $569.38 | 600 | 700 | 700 | 600 | 600 | 569 | 569 | 569 | 569 | $7,754 | 0.1% |
| ah | Utilities - Water/Wastewater | | $1,999.77 | $1,999.77 | $1,999.77 | $1,999.77 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | $25,997 | 0.5% |
| ai | Uniforms | | $70.00 | $70.00 | $70.00 | $70.00 | 70 | 70 | 70 | 70 | 70 | 70 | 70 | 70 | 70 | $910 | 0.0% |
| aj | Trash | | $1,019.69 | $1,019.69 | $1,019.69 | $1,019.69 | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 | 1,020 | $13,256 | 0.2% |
| ak | Legal Fees | | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | $110,000 | 2.0% |
| al | Consulting & Professional Fees | | $2,000.00 | $2,000.00 | $2,000.00 | $2,000.00 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | $26,000 | 0.5% |
| am | Accounting Fees & Server Hosting Fees | | $167.08 | $167.08 | $1,167.08 | $167.08 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | $10,668 | 0.2% |
| an | Royalties | 0.08 | $35,943.53 | $33,272.85 | $36,290.97 | $32,230.92 | 33,628 | 30,880 | 31,129 | 32,771 | 36,977 | 34,911 | 37,968 | 37,670 | 37,487 | $451,160 | 8.0% |
| ao | Insurance-Workers Comp | | $0.00 | $2,481.00 | $0.00 | $2,481.00 | | 2,500 | | 2,500 | | 2,500 | | 5,000 | | $17,462 | 0.3% |
| ap | Insurance | | $1,204.95 | $1,204.95 | $1,204.95 | $1,204.95 | 1,205 | 1,205 | 1,205 | 1,205 | 1,205 | 1,205 | 1,205 | 1,205 | 1,205 | $15,664 | 0.3% |
| aq | Health Insurance Premium | | $2,176.90 | $2,176.90 | $2,176.90 | $2,176.90 | 2,177 | 2,177 | 2,177 | 2,177 | 2,177 | 2,177 | 2,177 | 2,177 | 2,177 | $28,300 | 0.5% |
| ar | Dues & Subscriptions | | $147.54 | $147.54 | $147.54 | $147.54 | 148 | 148 | 148 | 148 | 148 | 148 | 148 | 148 | 148 | $1,918 | 0.0% |
| as | Travel & Lodging & Meals | | $229.23 | $229.23 | $229.23 | $229.23 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | $3,617 | 0.1% |
| at | Training Materials | | $0.00 | $0.00 | $2,500.00 | $0.00 | | - | - | 2,500 | | | 2,500 | | - | $7,500 | 0.1% |
| au | Miscellaneous | | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | $13,000 | 0.2% |
| av | Cash (over) short | | $414.15 | $414.15 | $414.15 | $414.15 | 414 | 414 | 414 | 414 | 414 | 414 | 414 | 414 | 414 | $5,384 | 0.1% |
| | Debt Repayments-post Bankruptcy | | $0.00 | $0.00 | $0.00 | $0.00 | - | - | - | - | - | - | - | 1 | | $1 | 0.0% |
| aw | Other Income | | -$34.64 | -$34.64 | -$34.64 | -$34.64 | (35) | (35) | (35) | (35) | (35) | (35) | (35) | (35) | (35) | -$450 | 0.0% |
| ax | Ohio Commercial Activity Tax | | $4,071.00 | $0.00 | $0.00 | $0.00 | 4000 | 0 | 0 | 4000 | 0 | 0 | 4000 | | | $16,071 | 0.3% |
| ay | Ohio Sales Taxes | | $5,537.55 | $5,126.10 | $5,591.08 | $4,965.58 | 5,656 | 5,194 | 5,236 | 5,512 | 6,219 | 5,872 | 6,386 | 6,336 | 6,305 | $73,935 | 1.3% |
| | | | | | | | | | | | | | | | | $0 | 0.0% |
| | | | | | | | | | | | | | | | | | 0.0% |
| | Total Expenses | | $469,428.66 | $394,795.41 | $445,298.59 | $402,912.71 | $ 426,177 | $ 342,023 | $ 396,922 | $ 421,834 | $ 456,560 | $ 437,572 | $ 473,205 | $ 468,104 | $ 461,222 | $ 5,596,056 | 99.2% |
| az | Trustee Quarterly Fees (1%) | 1.00% | $14,031.21 | $0.00 | $0.00 | $13,095.23 | | | 11,711 | | | | 17,129 | | | $55,966 | 1.0% |
| | Total Expenses + Trustee Fees | | $483,459.87 | $394,795.41 | $445,298.59 | $416,007.93 | $ 426,177 | $ 342,023 | $ 408,633 | $ 421,834 | $ 456,560 | $ 437,572 | $ 490,334 | $ 468,104 | $ 481,222 | $ 5,652,022 | 100.2% |
| | Forecasted Cash flow | | $ (28,628.25) | $ 26,241.34 | $ 13,929.60 | $ (8,155.82) | $ (169) | $ 49,173 | $ (14,280) | $ (6,687) | $ 11,873 | $ 4,682 | $ (9,346) | $ 9,107 | $ 13,668 | $ 61,407 | 1.1% |

E:\2TIG\Forecast\TIG forecast JUL18.JUN19 07.20.18 V2
TIG forecast JUL18.JUN19 v3

**EXHIBIT A**

7/20/2018